# United States Court of Appeals for the Federal Circuit

———————————

**KENT INTERNATIONAL, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

———————————

2021-1065

———————————

Appeal from the United States Court of International Trade in No. 1:15-cv-00135-LMG, Senior Judge Leo M. Gordon.

———————————

Decided: November 3, 2021

———————————

PATRICK CRAIG REED, Simons & Wiskin, New York, NY, argued for plaintiff-appellant. Also represented by PHILIP YALE SIMONS, JERRY P. WISKIN, South Amboy, NJ.

MONICA PERRETTE TRIANA, International Trade Field Office, United States Department of Justice, New York, NY, argued for defendant-appellee. Also represented by AIMEE LEE, JUSTIN REINHART MILLER; BRIAN M. BOYNTON, JEANNE DAVIDSON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC.

———————————

Before LOURIE, LINN, and DYK, *Circuit Judges*.

LINN, *Circuit Judge*.

Kent International, Inc. ("Kent") appeals the affirmance by the Court of International Trade ("Trade Court") of the decision by U.S. Customs and Border Protection ("Customs") denying Kent's claims that the classification of its imported merchandise under Harmonized Tariff Schedule of the United States ("HTSUS") heading 8714 violated 19 U.S.C. § 1625(c) by departing from a "treatment previously accorded" and was contrary to a de facto "established and uniform practice" ("EUP") under 19 U.S.C. § 1315(d). Because the Trade Court erred in approving Customs' use of bypass entries to show the absence of a treatment previously accorded, we reverse that ruling and remand. Because the Trade Court did not err in finding no de facto EUP, we affirm that part of the Trade Court's decision.

## BACKGROUND

Kent is an importer of bicycle-related products, including, as relevant here, children's bicycle seats. In 2005, Customs, in response to a request by Kent, issued a ruling letter ("2005 Ruling") stating that Kent's bicycle seats would be classified as "accessories of bicycles" under HTSUS heading 8714. Under that heading, Kent's bicycle seats would be subject to a 10% ad valorem duty. See *Kent Int'l. Inc. v. United States*, 466 F. Supp. 3d 1361, 1363 (Ct. Int'l Trade 2020) ("*Kent II*") (describing 2005 Ruling). The 2005 Ruling thereafter obligated Kent to initially enter its bicycle seats through Customs under heading 8714.

Between August 2008 and November 2010, Kent made 44 entries of its bicycle seats through the Port of New York/Newark, each time listing the subject merchandise under heading 8714 ("New York entries"). Starting in April 2008, after Customs classified a competitor's children's bicycle seats as "seats" under duty-free heading 9401, Kent

filed several protests, post-entry amendments and a first application for further review (collectively "New York protests") for its previously liquidated New York entries. Between August 2008 and November 2010, Customs approved the New York protests and reliquidated Kent's merchandise under heading 9401. Based on the favorable grants by Customs of Kent's New York protests, Kent, in April 2011, filed a second application for further review seeking to revoke the 2005 Ruling as inconsistent with Customs' subsequent treatment of its New York entries. Kent continued to make entries of its bicycle seats through the Port of New York/Newark after December 2010 and again lodged protests for each. Customs, however, stopped granting those protests and instead suspended them pending further review.

During the pendency of the New York protests, Kent began to import the same merchandise through the Port of Long Beach ("Long Beach entries"). Between December 4, 2008 and November 2010, Kent made eight entries of its bicycle seats through that port. Between November 2010 and March 31, 2014, Kent made an additional 37 entries through that port. Acting in compliance with the 2005 Ruling, Kent listed all of these entries under heading 8714. Long Beach Customs treated these entries as bypass entries and liquidated them under heading 8714 without examination or Customs officer review.

Kent protested the treatment of its Long Beach entries at the Port of Long Beach ("Long Beach protests"), contesting the classification of the subject merchandise under heading 8714 and seeking reclassification under heading 9401. Four of its protests were filed specifically for merchandise imported within the December 4, 2008, through November 2010 timeframe. At Kent's request, these four protests were suspended pending resolution of its New York protests. Although the New York protests were granted, all of Kent's Long Beach protests were denied after November 2010. *Kent II*, 466 F.Supp.3d at 1363–64.

In June 2014, Customs, through notice and comment, revoked its earlier decisions classifying three of Kent's competitors' merchandise under heading 9401, and concluded that the competitors' merchandise would be classified under heading 8714, effective September 22, 2014. *Id.* at 1364. On February 11, 2015, in response to Kent's April 2011 application for further review, Customs declined to revoke the 2005 Ruling and reaffirmed the classification of Kent's bicycle seats under HTSUS heading 8714.

Kent appealed the denial of its Long Beach protests to the Trade Court, alleging: (1) that the proper classification of its bicycle seats was under heading 9401; and (2) that the denials modified a treatment previously accorded by Customs and departed from a de facto EUP. The Trade Court bifurcated the classification issue from the treatment previously accorded and EUP issues. On the first issue, the Trade Court held that the merchandise was properly classified under heading 8714. *Kent Int'l, Inc. v. United States*, 393 F.Supp.3d 1218, 1225 (Ct. Int'l Trade 2019) (*Kent I*). Kent does not appeal that determination.

On the second issue, the Trade Court denied Kent's treatment previously accorded and EUP claims, finding no consistent treatment of Kent's bicycles seats under heading 9401 on a national basis over any two-year period in light of the liquidation of the Long Beach bypass entries under heading 8714. *Kent II*, 466 F.Supp.3d at 1367. The Trade Court specifically noted that 19 C.F.R. § 177.12(c)(1)(i) "does not limit the consideration of the court to only 'final Customs actions'" and held that Kent's pending protests of its Long Beach entries did not make those entries ineligible for consideration in the treatment analysis. *Kent II*, 466 F.Supp.3d at 1367–68. The Trade Court also considered and denied Kent's claim of treatment based on the entries of third parties for the same reason—the liquidation of Kent's Long Beach bypass entries under HTSUS 8714. The Trade Court did not directly address the propriety of considering bypass entries not subjected to examination or

Customs officer review in the treatment analysis. The Trade Court also expressly declined to address the applicable two-year time period in the treatment analysis. *Kent II*, 466 F.Supp.3d at 1368 n.1.

The Trade Court also rejected Kent's argument that Customs' liquidation of Kent's New York entries and third-party entries under heading 9401 created a de facto EUP. The Trade Court held that Kent's claim would have the court disregard the 2005 Ruling, which was never revoked, classifying Kent's bicycles seats under heading 8714. It concluded that that ruling, as well as the classification of the Long Beach entries under 8714, "demonstrate[d] that Customs did not engage in an established and *uniform* practice of classifying child safety seats under heading 9401." *Id.* at 1369 (emphasis in original).

Kent appeals. We have jurisdiction over a final decision by the Trade Court under 28 U.S.C. § 1295(a)(5).

## ANALYSIS

### I.

#### A.

"We review the [Trade Court's] grant of summary judgment de novo, applying 'the same standard used by the [Trade Court] in reviewing Customs' classification determination.'" *Apple Inc. v. United States*, 964 F.3d 1087, 1092 (Fed. Cir. 2020) (*quoting Otter Prods., LLC v. United States*, 834 F.3d 1369, 1374–75 (Fed. Cir. 2016)). We review the Trade Court's conclusions on legal issues de novo. *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019).

#### B.

19 U.S.C. § 1625(c)(2) mandates that any duty classification decision that would "have the effect of modifying the *treatment previously accorded* by the Customs Service to substantially identical transactions," (emphasis added)

must be made by notice and comment. In explaining what is meant by "treatment previously accorded," Customs regulations provide:

(1) . . . The following rules will apply for purposes of determining under this section whether a treatment was previously accorded by Customs to substantially identical transactions of a person:

(i) There must be evidence to establish that:

(A) There was an actual determination by a Customs officer regarding the facts and issues involved in the claimed treatment;

(B) The Customs officer making the actual determination was responsible for the subject matter on which the determination was made; and

(C) Over a 2–year period immediately preceding the claim of treatment, Customs consistently applied that determination on a national basis as reflected in liquidations of entries or reconciliations or other Customs actions with respect to all or substantially all of that person's Customs transactions involving materially identical facts and issues.

(ii) The determination of whether the requisite treatment occurred will be made by Customs on a case-by-case basis and will involve an assessment of all relevant factors.

In particular, Customs will focus on the past transactions to determine whether there was an examination of the merchandise (where applicable) by Customs or the extent to which those transactions were otherwise reviewed by Customs to determine the proper application of the Customs laws and regulations.

*For purposes of establishing whether the requisite treatment occurred . . . Customs will give no weight whatsoever to informal entries and to other entries or transactions which Customs, in the interest of commercial facilitation and accommodation, processes expeditiously and without examination or Customs officer review.*

37 C.F.R. § 177.12(c)(1) (emphases added).

Kent argues that Customs' denial of its Long Beach protests violated 19 U.S.C. § 1625(c)(2) by modifying the treatment previously accorded Kent's New York entries without the necessary notice and comment. According to Kent, during the two-plus year period between August 2008 and November 2010, the only determinations made by actual Customs officials—the approval of protests with respect to the New York entries—placed Kent's merchandise under heading 9401. Kent argues that 37 C.F.R. § 177.12(c)(1)(ii) prohibits consideration of the automatically liquidated Long Beach entries in the determination of whether there was a treatment previously accorded. Kent further argues that the Long Beach entries could not be considered in determining whether there was a treatment previously accorded because they were subject to Kent's protest, and were therefore non-final.

The government responds that while Customs is prohibited under 19 C.F.R. § 177.12(c)(1)(ii) from considering bypass entries for purposes of determining whether an

importer has *established* the requisite treatment, a sepa-
rate part of the regulation, 19 C.F.R. § 177.12(c)(1)(i)(C),
authorizes Customs to consider "liquidations" generally,
for purposes of analyzing whether the agency consistently
applied a determination on a nationwide basis over a two-
year period. Appellee's Br. at 14 and 22. The government
notes that in subparagraph (c)(1)(ii) the regulation uses the
word "establishing" when prohibiting the use of bypass en-
tries, but in subparagraph (c)(1)(i)(C) the regulation uses
the word "determining" when requiring Customs to take
into account "liquidations" without limitation.

A plain reading of the regulation supports Kent's posi-
tion. The touchstone of the treatment previously accorded
inquiry is the consistency of *Customs* decisions with respect
to the subject merchandise. 37 C.F.R. § 177.12(c)(1)(ii)
("Customs will focus on the past transactions to determine
whether there was an examination of the merchandise
(where applicable) by Customs or the extent to which those
transactions were otherwise reviewed by Customs."). The
requirement for examination or Customs officer review is
wholly consistent with the limitation in § 177.12(c)(1)(ii)
that "Customs will give no weight" to unexamined entries,
without regard to whether those unexamined entries are
used as positive or negative evidence of treatment.

In *Motorola*, we deferred to Customs' position that by-
pass entries "do[] not constitute 'treatment' within the
meaning of section 1625(c)(2)." *Motorola, Inc. v. United
States*, 436 F.3d 1357, 1366–67 (Fed. Cir. 2006). We ex-
plained that "[i]t is reasonable to conclude that goods which
are admitted pursuant to representations by the importer
and are not independently examined or reviewed by the im-
porter are not 'treated' by Customs." *Id.* at 1366. *Motorola*
addressed the circumstance where an importer was citing
its bypass entries as affirmative evidence of a treatment,
unlike here, where Customs is citing bypass entries to deny
a claim of treatment. But that is a distinction without a
difference. The bypass entries in both circumstances are

made without examination or Customs officer review and do not reflect "treatment" by Customs.

The government argues that a Federal Register notice in 2002 makes clear that the regulation only limits the use of bypass entries as affirmative evidence of a treatment. *See* 67 Fed. Reg. 53483, 53491 (Aug. 16, 2002) ("Therefore, the proposed regulatory text stands for the proposition that, in order for a person to be *eligible for the protection* afforded under 19 U.S.C. 1625(c)(2), that person must be able to make a showing that Customs took a conscious, intentional and knowledgeable action that created an impression that could give rise to an expectation as regards future action by Customs." (emphasis added)). The government's reliance on the Federal Registrar notice, however, is misplaced and begs the question. Determining whether an importer is "eligible for protection" is most naturally read to limit the use of bypass entries as both positive and negative evidence of a treatment previously accorded.

The government also argues that the regulations require consistent treatment of "*all or substantially all* of that person's Customs transactions," meaning that bypass entries inconsistent with that treatment can and should inform that determination. This argument fails for the same reason as noted above: the regulation expressly assigns zero weight to bypass entries liquidated without Customs review.

Finally, the government argues that consideration of the Long Beach entries was proper because their liquidation under HTSUS 8714 merely implemented Customs' 2005 Ruling. The fact of the 2005 Ruling, however, does not render the bypass entries any more appropriate for consideration than if the 2005 Ruling had never been made. Nor does it undermine Kent's assertion of a treatment previously accorded. The Long Beach entries were not the only entries in play. The New York entries, which were *also* liquidated initially under HTSUS 8714 pursuant to

the 2005 Ruling, were subject to approved protests and Amendments that reliquidated those entries under HTSUS 9401. The approved protests and Amendments were "actual determinations" that are proper for consideration in assessing the treatment previously accorded.

In conclusion, the Trade Court erred in its construction of § 177.12(c)(1)(ii) as allowing consideration of bypass entries in the determination of whether there was a treatment previously accorded.[1] Because Customs improperly gave weight to the Long Beach entries in determining whether there was a treatment previously accorded, we vacate that part of the Trade Court decision and remand for consideration of whether there was a treatment previously accorded without considering those entries.[2]

## C.

The government also argues that the two-year period Kent identifies, August 2008 through November 2010, is not the correct time period, because that is not the "2-year period immediately preceding the claim of treatment" as required by the regulation. *See* 37 C.F.R. § 177.12(c)(1)(i)(C). The government argues that the date of the "claim of treatment" is the date of Kent's first affected entry, i.e., "the first entry that does not receive the anticipated, relied on treatment." *See Am. Fiber & Finishing v. United States*, 121 F.Supp.3d 1273, 187 (Ct. Int'l

---

[1]   Because we conclude that the Long Beach entries, as bypass entries, should not have been considered in determining treatment previously accorded, we need not and do not consider whether Customs properly may consider determinations subject to protest or suspended protest.

[2]   We also leave to the Trade Court to determine whether Customs may or should consider Customs' treatment of the third-party importers here in determining whether there was a treatment previously accorded.

Trade 2015).  The government thus identifies the applicable period as the two years preceding December 4, 2008, the date of the first Long Beach entries.  Kent argues that its Long Beach entries were under a suspended protest, and that the grant of the New York protests gave Kent the right for a disposition of the Long Beach protests in accordance with the New York protest.  In other words, Kent argues that, unlike *American Fiber & Finishing*, where the claim of treatment was based on a consistent treatment of *entries*, Kent's claim of treatment is based on the New York protest approvals, and that the "claim of treatment" date is thus November 2010, when the New York protests were approved and the merchandise reliquidated under heading 9401.

We leave this question to the Trade Court for its determination in the first instance on remand.

## III.

Kent also argues that the Trade Court erred in finding no de facto established and uniform practice ("EUP") under 19 U.S.C. § 1315(d) and *Heraeus-Amersil, Inc. v. United States*, 795 F.2d 1575 (Fed. Cir. 1986).  We may overturn Customs' determination that an EUP did not exist only for "a clear abuse of discretion."  *Heraeus-Amersil*, 795 F.2d at 1580 n.7.  There was no clear abuse of discretion here.

A so-called de facto EUP arises when Customs consistently classifies a particular type of merchandise under a specific HTSUS heading prior to some distinct point in time.  *Kent II*, 466 F.Supp.3d. at 1368.  The requirements for establishing a de facto EUP are stringent.  *See Jewelpak Corp. v. United States*, 297 F.3d 1326, 1332 (Fed. Cir. 2002).  In denying Kent's claim that the agency violated a de facto EUP, Customs relied on the fact that the 2005 Ruling was never revoked, that the Long Beach entries were classified under heading 8714, that hundreds of entries at 14 ports of entry over a 10-year period classified the same goods under heading 9401 and that similar goods imported

by three of Kent's competitors were initially classified under heading 9401 and later reclassified under heading 8714. *Kent II*, 466 F.Supp.3d at 1369. The Trade Court ultimately decided that under these facts, it could not reasonably conclude that Customs engaged in a uniform practice of classifying these goods or that there was a lack of uncertainty regarding classification.

Kent has failed to show a clear abuse of discretion in denying its claim of a de facto EUP.

## CONCLUSION

For the foregoing reasons, we vacate-in-part the Trade Court's determination of no treatment previously accorded and remand for a determination of whether there was such a treatment, excluding consideration of the bypass entries. We also remand for a determination in the first instance of the proper time period in which to consider the treatment previously accorded question. Finally, we affirm-in-part the Trade Court's determination that there was no de facto EUP.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.**

## COSTS

Costs are awarded to Kent.